**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**THE CHILDREN FIRST FOUNDATION, INC**.,
a New York non-profit organization,

                                        Plaintiff,

        - v -                                           Civ. No. 1:04-CV-0927
                                                        (NPM/RFT)

**RAYMOND P. MARTINEZ**, individually;
**DAVID J. SWARTZ**, in his official capacity
as Commissioner of the New York Department
of Motor Vehicle; **JILL A. DUNN**, individually;
**NEAL SCHOEN**, in his official capacity as Deputy
Commissioner and Counsel for the New York Department
of Motor Vehicles; **GEORGE E. PATAKI**,
individually, and **ELIOT SPITIZER**, in his official
capacity as Governor of the State of New York.
                                        Defendants.

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**APPEARANCES**:                        **OF COUNSEL**:

ALLIANCE DEFENSE FUND                   BRIAN W. RAUM, ESQ.
*Attorney for Children First Foundation, Inc.*
15100 N. 90th Street
Scottsdale, AZ 85260

ALLIANCE DEFENSE FUND                   JAMES M. JOHNSON, ESQ.
*Attorney for Children First Foundation, Inc.*
401 Market Street, Suite 900
Shreveport, LA 71101

ALLIANCE DEFENSE FUND - DC OFFICE       JEFFREY A. SHAFER, ESQ.
*Attorney for Children First Foundation, Inc.*
801 G. Street N.W., Suite 509
Washington, D.C. 20001

HISCOCK & BARCLAY, LLP                  LINDA J. CLARK, ESQ.
*Attorney for Jill A. Dunn, individual capacity*   MICHAEL J. GRYGIEL, ESQ.
50 Beaver Street
Albany, N.Y. 12207-2830

HOUGUET, NEWMAN LAW FIRM
*Attorney for George Pataki, individual capacity*
10 East 40ᵗʰ Street
New York, N.Y. 10016

IRA J. LIPTON, ESQ.
ELIZABETH A. MUSELLA, ESQ.

HARRIS BEACH PLLC
*Attorney for Raymond Martinez, individual capacity*
677 Broadway, Suite 1101
Albany, N.Y. 12207

MARK J. MCCARTHY, ESQ.

HON. ANDREW M. CUOMO,
Attorney General For The State Of New York
*Attorney for Neal Schoen, Eliot Spitzer,*
*and David J. Swartz, in their official capacities*
The Capitol
Albany, N.Y. 12224

SENTA B. SIUDA, ESQ.
Asst. Attorney General

## MEMORANDUM-DECISION AND ORDER

The State Defendants served upon Children First Foundation (CFF) a privilege log.  *See* Dkt.

No. 114-13, Privilege Log.  After engaging in conferences with the other parties and the Court about

the State Defendants' asserted privileges and their impact upon future disclosure and depositions,

CFF filed a Motion to Compel the disclosure of approximately 374 pages of documents, which the

the State Defendants claim are privileged under various legal doctrines.  Dkt. No. 113, Pl's. Mot.

to Compel, dated June 1, 2007.  The State Defendants oppose CFF's Motion and, in doing so,

provided a privilege log and submitted to the Court for an *in camera* review those documents

designated as privileged.[1]  Dkt. No. 114.  Defendant Pataki joins the State Defendants in opposing

---

[1] The lineup of Defendants and their respective legal representation has changed since the inception of this case. At the moment the State Defendants served and filed their Opposition to the Motion to Compel, they were Commissioner David Swartz, Deputy Commissioner and Counsel Jill A. Dunn, and Governor Eliot Spitzer, all represented by the Attorney General's Office in their official capacities.  Former Governor George E. Pataki, Jill A. Dunn, and former Commissioner Raymond P. Martinez were sued in their individual capacities as well and have their own independent counsel.  Shortly after the State Defendants filed their Opposition, Jill A. Dunn was terminated from her employment and Neal Schoen replaced her as Deputy Commissioner and Counsel.  Thus, Schoen appears in this action in his official capacity and Dunn solely in her individual capacity.

the Motion to Compel.  Dkt. No. 118, Ira J. Lipton, Esq. Decl., dated July 20, 2007.  Other than

recognizing that the privileges were properly asserted by the State Defendants, Defendant Martinez

takes no further position with respect to the pending Motion.  Dkt. No. 122, Mark J. McCarthy, Esq.

Decl., dated July 20, 2007.  As to Defendant Dunn, she filed, under seal, a Response to Plaintiff's

Motion to Compel which, in essence, is a Cross Motion asserting that the privileges cloaking

selected documents should be waived.  Dkt. No. 116, Linda J. Clark, Esq. Decl., dated July 19, 2007,

& Dkt. No. 117, Dunn's Mem. of Law, dated July 19, 2007.  Because of the complexity of the

Motions, the Court granted CFF and the State Defendants the opportunity to file a Reply and Sur-

Reply, respectively.  On July 20, 2007, CFF filed a Reply to the State Defendants' Opposition (Dkt.

No. 121), and the State Defendants filed their Reply (Dkt. No. 147) to Dunn's Cross Motion on

September 20, 2007.

# I. BACKGROUND

Even though familiarity with the facts could be presumed, a brief recitation of the case

history is warranted.[2]

## A.  CFF's Complaint

Pursuant to New York's Vehicle and Traffic Law § 401 *et seq*., the Commissioner of the

Department of Motor Vehicles (hereinafer "DMV") was granted authority to establish three distinct

categories of custom license plates: "Historical and Vintage Plates," "Special Number Plates," and

"Picture Plates."  Dk. No. 49, First Am. Compl. at ¶¶ 10-13.[3]  Basically, picture plates are commonly

---

[2] For a complete recitation of the facts, this Court refers the reader to the Memorandum-Decision and Order, dated August 3, 2007.  Dkt. No. 128.

[3] Originally, the Complaint was filed on August 4, 2004.  Dkt. No. 1.  The First Amended Complaint was filed on September 8, 2006, after the Second Circuit dismissed the the State Defendants' Appeal of their First Motion to Dismiss.  *See* Dkt. No. 35, Second Circuit Mandate; *Children First Foundation, Inc., et. al. v. Martinez, et. al.*, 169 Fed.

known as logo plates which permit a picture or logo in addition to an identification plate number. *Id.* at ¶ 16.  As a part of the picture plate program, there are several sub-categories, which include, *inter alia*, "Organizations and Causes."  *Id.* at ¶ 17.  A significant feature of this program permits picture plates to be used to raise funds for non-profit agencies.   Although many of these "Organizations and Causes" picture plates have already been approved by the State Legislature, the majority are approved by the New York Department of Motor Vehicles (DMV).  *Id.* at ¶¶ 21-27.

CFF, a New York not-for-profit corporation, submitted an application to the DMV for a picture plate that would have the tag line "Choose Life."  *Id.* at ¶¶ 33, 39 & 50-55.  CFF's application for this plate was rejected repeatedly by the Commissioner of the DMV, modifications notwithstanding.  *Id.* at ¶¶ 50-70, Exs. to Am. Compl.

On August 4, 2004, CFF filed a civil rights action, pursuant to 42 U.S.C. § 1983, against the Defendants in their various capacities alleging that they violated CFF's constitutional rights to freedom of speech, due process, and equal protection of the law.  Dkt. Nos. 1, Compl., & 49, First Am. Compl.  The crux of CFF's Complaint is that the rejections of their proposed picture plate with the tag line "Choose Life" were content-based and constituted viewpoint discrimination.  First Am. Compl. at ¶ 109.

Rather than serve an Answer, Defendants filed a Motion to Dismiss, pursuant to FED. R. CIV. P. 12(b)(6).  Dkt. No. 7, Defs.' Mot. to Dismiss, dated Nov. 15, 2004.   Among the many issues presented to the Honorable Neal P. McCurn, Senior District Judge, were the doctrine of qualified immunity and whether Defendants' actions, particularly Martinez's, were reasonable and viewpoint neutral.   After hearing oral arguments, Judge McCurn ruled that CFF had sufficiently alleged

---

Appx. 637 (2d Cir. 2006).

violations of the First and Fourteenth Amendments to the United States Constitution, though claims for money damages against Defendants in their official capacities were dismissed.  Dkt. Nos. 16, Min. Entry, dated Jan. 4, 2005, 17, & Hr'g Tr. at pp. 70-73.  In terms of Defendants' qualified immunity defense, Judge McCurn decided not to consider the qualified immunity defense under a Rule 12(b)(6) motion to dismiss analysis and suggested that this affirmative defense could be asserted within an answer and raised later during a motion for summary judgment.  Hr'g Tr. at p. 76.

Shortly thereafter, the State Defendants filed a Motion for Reconsideration of the January 4, 2005 Ruling and Order, pursuant to FED. R. CIV. P. 54(b), primarily raising the matter of qualified immunity again and arguing that such defense should be addressed within a motion to dismiss context.  Dkt. No. 18, Defs.' Mot. to Recons.  In addressing this issue, Judge McCurn found that "[D]efendants have not established that the facts on the face of the [C]omplaint support a qualified immunity defense."  Dkt. No. 31, Mem.-Decision & Order, dated Mar. 14, 2005, at p. 5 (citations omitted).  Defendants immediately filed a Notice of Appeal as to both the January 5 and March 14, 2005 Orders.  Dkt. Nos. 23 & 32.

On March 6, 2006, the Second Circuit issued a Summary Order dismissing Defendants' appeal.  Dkt. No. 35, Second Circuit Mandate; *Children First Foundation, Inc., et. al. v. Martinez, et. al.*, 169 Fed. Appx. 637 (2d Cir. 2006).  "Because the facts supporting the defense of qualified immunity do not appear on the face of the complaint," the Second Circuit decided it lacked appellate jurisdiction to address this defense at that juncture.  *Id*.  Accordingly, the Second Circuit remanded the action back to the District Court.

As noted above, the First Amended Complaint was filed on September 8, 2006 (Dkt. No. 49;

*see supra* note 1), and an Answer to the Amended Complaint was filed on October 11, 2006 (Dkt. No. 51).  Within that Answer, and in addition to denials of the allegations, the State Defendants pled affirmative defenses, including the qualified immunity defense.  Dkt. No. 51 at ¶ 131 ("At all relevant times, defendants acted under the reasonable belief that their conduct was in accordance with clearly established law.  They are, therefore, protected under the doctrine of qualified immunity.").[4]

From this lawsuit's inception until approximately January 31, 2007, Defendants have had only one attorney, the Attorney General.  However, on January 31, 2007, the law firm of Houguet Newman & Regal, LLP, Ira J. Lipton, Esq., of counsel, filed a Notice of Appearance on behalf of George E. Pataki in his individual capacity.  Dkt. No. 59.  A month later, the law firm of Hiscock & Barclay, Linda J. Clark, Esq., of counsel, filed a Notice of Appearance on behalf of Jill A. Dunn, in her individual capacity.  Dkt. No. 61.  And most recently, the law firm of Harris Beach PLLC, Mark J. McCarthy, Esq., of counsel, filed a Notice of Appearance on behalf of Raymond P. Martinez in his individual capacity.  Dkt. No. 106.  Shortly after Dunn was represented in her individual capacity by a private firm, she sought to amend her Answer to add the government speech doctrine and establishment clause neutrality defense as affirmative defenses in this action.  Dkt. No. 67, Dunn's Mot. to Amend Answer, dated Mar. 22, 2007.  On August 3, 2007, this Court granted Dunn the right to amend her Answer to add the establishment clause neutrality defense but denied her the

---

[4] Immediately after the the State Defendants had filed their Motion for Reconsideration (Dkt. No. 18), the State Defendants filed an Answer and therein preserved the qualified immunity defense for Defendants Martinez, Dunn, and Pataki, who were sued in their individual capacities as well.  Dkt. No. 21, Ans., dated Feb. 1, 2005, at ¶ 152.

right to plead the government speech doctrine.  Dkt. No. 128, Mem-Decision & Order.[5]

### B.  Pending Motions

We are uncertain when the State Defendants' served their privilege log (Dkt. No. 114-13), wherein they asserted the deliberative process privilege, the attorney-client privilege, and the work product doctrine, upon all other parties.  But we do know that the service of the log did not initially trigger either a motion to compel from opposing parties nor a motion for protective order from the the State Defendants.  It appears likely that the current wave of motions were triggered by the State Defendants' Letter-Brief, dated March 23, 2007 (Dkt. No. 70), that eventually segued into a Discovery Hearing held on March 30, 2007.  *See* Dkt. No. 154, Hr'g Tr.  Several complex and sensitive issues related to the State Defendants' asserted privileges were discussed during this Discovery Hearing.  Yet, the most sensitive and prominent topic discussed during the Hearing involved Dunn and whether she could pierce her client's (DMV) and the State Defendants' asserted privileges in order to defend herself.  Such piercing, of course, would be compounded by the matter of an attorney's ethical obligations to her client.  Based upon the nature and complexity of these issues, we  issued an Order granting Dunn permission to file a Motion for a Privilege Ruling.  Dkt. No. 83, Order, dated Mar. 30, 2007.  Because the parties would be delving into sensitive issues and facts, the Court also directed, in accordance with *In re New York Times Co.*, 828 F.2d 110 (2d Cir. 1987) and *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006), that the motions be filed under seal, with redacted memoranda of law to be filed on the Court's Docket and served on Plaintiff's and Pataki's counsel.  *Id.* at pp. 2-3.  Furthermore, the documents and communications

---

[5] Dunn has not filed an Amended Answer because there are Cross Appeals as to this Court's August 3rd Memorandum-Decision and Order. *See* Dkt. Nos. 130, Pl's. Appeal, dated Aug. 17, 2007, & 131, Dunn's Mot. to Vacate (Appeal), dated Aug. 17, 2007.  Oral arguments were heard by Senior District Judge McCurn on September 25, 2007, and he has reserved decision.  Dkt. No. 150, Min. Entry.

at issue with respect to the asserted privileges, along with supporting affidavits providing, *inter alia*, an explanation of why the specific document is protected by one of the privileges, were to be filed under seal for an *in camera* review. *Id*. at p. 3.[6]

At the time this Order was issued, we were under the impression that only Dunn was anxious to address the privilege issues and our briefing schedule reflected that belief. *Id*. at pp. 3-4. However, Dunn submitted a Letter Motion mentioning that the normal sequence of a motion that pertains to privileged documents should be commenced by the Plaintiff as well as raising reasons why Dunn should not take the lead on such a motion because of attorney-client ethical considerations. Dkt. No. 85. Shortly thereafter the parties submitted a new briefing stipulation (Dkt. No. 89), which was granted. Dkt. No. 90, Text Order, dated Apr. 16, 2007.[7]

There are 374 pages of documents that the State Defendants assert are protected by one or more privileges, which were submitted for an *in camera* review. Dkt. No. 114-13, Privilege Log. CFF filed its Motion to Compel and, obviously, not being privy to the documents claimed to be

---

[6] This Order is consistent with the Court's Ruling at the March 30th Discovery Hearing:

| The Court: | Because of the sensitive nature of the communication, Ms. Clark, on behalf of Ms. Dunn, [and] Mr. McCartin, on behalf of the the State Defendants, will be presenting to the Court the confidential documents in issue, they will be providing a sealed declaration of facts that would support their claim as to those privileges . . . [and] there will be two memorandum of law coming from both of them. There would be one memorandum of law that will be discussing the law and possibly those facts that are revealed in the declaration. . . . Mr. Raum, Mr. Shafer . . . Mr. Lipton [and] Miss Musella, . . . will be receiving a redacted memorandum of law with only the discussion of the law. All other parties will have an opportunity to file a memorandum of law based upon what they receive. . . . |
|---|---|
| Mr. Shafer: | You're suggesting that we'll be able to participate in the briefing of the legal issues, but we not be permitted to know about the underlying facts, is that correct? |
| The Court: | That's correct[.]. |

Hr'g Tr. at pp. 102-03.

To the extent there was any confusion as to what must be served and filed, that confusion was resolved at a recent conference. *See* Dkt. No. 156, Min. Entry, dated Nov. 20, 2007.

[7] For various reasons, the briefing schedule was amended several times. *See* Dkt. No. 112, Order, dated May 15, 2007, Text Order, dated July 30, 2007, & Text Order, dated Aug. 24, 2007.

privileged, CFF was relegated to discussing the legal issues broadly.  Dkt. No. 113-2, Pl.'s Mem. of Law.  In turn Dunn, seeking disclosure of privileged documents and permission to testify accordingly in order to defend herself, raises two grounds in her Cross Motion namely that such disclosure is permitted pursuant to (1) New York Disciplinary Rule 4-101(C)(4) (attorney may pierce the attorney-client privilege in order to defend herself) and (2) an "at issue" waiver has resulted from the assertion of the qualified immunity affirmative defense.  Dkt. Nos. 116 & 117. The State Defendants oppose both Applications and have submitted the requisite affidavit elaborating on the nature and the circumstances of the asserted privileges.  Dkt. Nos. 114 & 147.

## II.  DISCUSSION

### A.  Privilege Log

Plaintiff stakes the position that these Logs fail to comport with statutory requirements and because of the inadequacy of the Logs this Court should deem all of the privileges listed therein waived for all purposes.  Controverting Plaintiff's position, Defendants defend the adequacy of the Logs, however, if the adequacy of the Logs is found to be unsatisfactory, Defendants argue vociferously that the suggested remedy of a wholesale waiver is drastic, unwarranted, and untenable. In terms of the adequacy of the Logs, we agree with the Plaintiff's assessment.

A proponent of a privilege log must " expressly make the claim and describe the nature of the documents, communications, or tangible things not produced or disclosed and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  FED. R. CIV. P. 26(b)(5)(A)(i) & (ii).[8]  In this respect, and in order to evaluate and facilitate the determination of whether a privilege exists, courts generally require compliance with

---

[8] Since the State Defendants are asserting the privileges, it is their burden to provide the necessary information to support their assertions.

this statutory mandate that an adequately detailed privilege log be provided. *United States v. Constr. Prod. Research, Inc*., 73 F.3d 464, 473 (2d Cir. 1996) (citations omitted). Without an adequately detailed privilege log, the opposing party and even the courts are hamstrung in their attempt to decipher the presence and the extent of the claimed privilege. An acceptable privilege log, at a minimum, should provide facts that would establish each element of the claimed privilege as to each document, and "identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure. Other required information, such as the relationship between individuals not normally within the privileged relationship, is then typically supplied by affidavit or deposition testimony." *Trudeau v. New York State Consumer Prot. Bd.*, 237 F.R.D. 325, 334 (N.D.N.Y. 2006) (quoting *United States v. Constr. Prod. Research, Inc.*, 73 F.3d at 473 & citing *Strougo v. BEA Assoc.*, 199 F.R.D. 515, 519 (S.D.N.Y. 2001)). In determining the asserted privileges, courts have broad discretion as to how to proceed and can use an adequately detailed privilege log along with "evidentiary submissions to fill in any factual gaps." *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 474 (S.D.N.Y. 1993); *see also In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32 (2d Cir. 1986) (affidavit and documents submitted *in camera*); *In re John Doe Corp.*, 675 F.2d 482 (2d Cir. 1982) (same).[9] When a party fails to comply with the requirements of Rule 26(b)(5) by submitting a privilege log that is inadequate by virtue of not providing sufficient support of the privilege, the claim of privilege may be denied. *Johnson v. Bryco Arms*, 2005 WL 469612, at *3-4 (E.D.N.Y. Mar. 1, 2005) (citing *United States v. Constr.*

---

[9] In our Order, dated March 30, 2007, we directed the the State Defendants to provide an affidavit by a person with particular knowledge setting forth those details identified as crucial for any analysis of the privilege in compliance with *United States v. Const Prod. Research, Inc*., 73 F.3d 464 (2d Cir. 1996). Defendant Neal Schoen who is DMV's Deputy Commissioner and Counsel provided such an affidavit, under seal.

*Prod. Research, Inc.*, 73 F.3d at 474).

CFF challenges the sufficiency of the Log, claiming further that it is devoid of any factual indications to support that a specifically referenced document's content is indeed privileged. Dkt. No. 113-2, Pl.'s Mem. of Law at pp. 6-7, & 9-10. Similarly, CFF notes that the State Defendants have failed to describe the nature of the documents in a manner such that a reasonable person could discern whether the privilege is properly asserted. Consequently, the paucity of information has caused CFF to make a blanket challenge to all of the documents listed. *Id*. at p. 7. In viewing the Log, we agree with CFF that the "subject matter" substance is not detailed enough to permit a reasonable judgment on the specific documents. Considering the deficiencies of the State Defendants' Log, it would, nonetheless, be too austere a remedy to deny the asserted privileges when the deficiencies have been readily rectified by a more comprehensive, sealed affidavit. *Export-Import Bank of United States v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 111 (S.D.N.Y. 2005) (directing the proponent of a privilege what other specificity is required). Although CFF remains at a disadvantage, the Court, relying upon the sealed affidavit, has ample information to fully appreciate the disputation on the privileges. *Trudeau v. New York State Consumer Prot. Bd.*, 237 F.R.D. at 335.

Conversely, it is unfair for the State Defendants to chastise CFF for making nonspecific blanket objections to the Log and it is also unreasonable for them to protest that CFF's objections are not sufficiently focused in order to compel disclosure. Dkt. No. 114-2, State Defs.' Mem. of Law at pp. 3-4. CFF cannot be held solely responsible for the brevity or lack of specificity with its objections because the Log is relatively sparse as to the nature of the documents and why one or more privileges may attach thereto, and, additionally, CFF was not privy to the documents in

question.  Considering the quantity and quality of the information provided in the Log, CFF was still able to discuss reasonably well a number of documents and why the privileges should not survive and further discuss the legal standard upon which the various privileges may rest.  Dkt. No. 113-2 at pp. 9-16.  The Court will set aside the State Defendants' complaints and weigh accordingly CFF's objections.

### B.  Deliberative Process Privilege

The State Defendants claim a mass of documents as protected by the deliberative process privilege.[10]  Dkt. No. 113.  Many, if not all, of these documents are purportedly and additionally cloaked by either the attorney-client privilege or the work product doctrine.  CFF complains that "Defendants engaged in and facilitated content-based and viewpoint-based discrimination and the exercise of unbridled discretion during the course of their review and ultimate denial of the requested plate designs."  Dkt. No. 49, Am. Compl. at ¶ 112.  CFF further charges that Defendants "rel[ied] upon vague and overbroad policies . . . [and] enforced [those] policies in an *ad hoc* and arbitrary manner."  *Id*. at ¶¶ 119 & 120.  In making these incriminations, CFF complains that the Defendants' violated its First Amendment rights to be free of prior restraints on its speech, and its Fourteenth Amendment rights of due process and equal protection.  In CFF's view, the deliberation process that led to the denial of its applications is one of the issues in this litigation and, hence, the deliberative process privilege cannot stand.

The deliberative process privilege is a sub-species of the work product doctrine that covers documents reflecting advisory opinions, recommendations, draft documents, proposals, suggestions,

---

[10]  Those documents are designated as P 5-8, 10-11, 24-38, 51-58, 61-62, 65, 67, 70-84, 89-96, 105, 112-113, 116-125, 127-151, 193-202, 215-263, 286-288, 289-293, 295-297, 299-318, 321-324, 331, 335-336, 339, 346-349, 351-352, 366, 367, 374.

and any other subjective documents that reflect the personal opinions of the writer rather than the

agency and deliberations comprising part of a process by which governmental decisions and policies

are formulated.[11]  *Tigue v. United States Dep't. of Justice*, 312 F.3d 70, 76 & 80 (2d Cir. 2002); *A.*

*Michael's Piano, Inc. v. F.T.C.*, 18 F.3d 138, 147 (2d Cir. 1994) (stating that the privilege "protects

the decisionmaking processes of the executive branch in order to safeguard the quality and the

integrity of governmental decisions" (citation omitted)).  In order for a document to be protected by

this privilege, it must be an inter-agency or intra-agency document which is both predecisional and

---

[11] The State Defendants exhort the Court to consider the "constitutional" dimension of the deliberative process privilege, which in their view derives from the separation of powers of the United States Constitution, particularly Article II, citing *United States v. Nixon*, 418 U.S. 683 (1974).  Dkt. No. 114-2, Defs.' Mem. of Law at pp. 5-7.  We suppose that they have cast the privilege as constitutional in order to give the debate more gravitas.  In support of this notion, they quote the Supreme Court as stating that "[c]ertain powers and privileges flow from the nature of the enumerated powers; the protection of the confidentiality of [executive branch] communications has similar constitutional underpinnings," *id.* at p. 6 (quoting *United States v. Nixon*, 418 U.S. at 705), but we note that the alteration in quote, which is material, struck the specific reference to the "President."  The crucible of the Nixon case was the expectation of a <u>President,</u> as he exercises his Article II enumerated powers, to have confidentiality to his conversations and correspondences as may exist under Article II of the United States Constitution.  The *Nixon* case seems to have narrowly tailored this exquisite privilege to those conversations between the President and his staff which are "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution."  *Id.* at 708.  We do not agree that this Presidential Communication Privilege, as it is generally called, extends broadly to every executive agency that is not communicating directly with the President or his executive staff.  *Nixon* recognizes that the Presidential Communication Privilege belongs exclusively and uniquely to the President of the United States and no other entity. *Hobley v. Chicago Police Commander Burge*, 445 F. Supp. 2d 990, 998 (N.D. Ill. 2006) (citing *Cheney v. United States Dist. Ct. of Dist. of Columbia*, 542 U.S. 367, 381-82 (2004)); *Bennett v. City of Boston*, 54 F.3d 18, 20 (1ˢᵗ Cir. 1995) (surveying other circuits that have stated that *Nixon* was "not meant to extend . . . to any other government official other than the President himself").  There is, however, a distinct federal deliberative process privilege for executive branch agencies which has a "different scope" from the President's Communication Privilege that rests solely upon Article II and the separation of powers.  *Hobley*, 445 F. Supp. 2d at 997-98.  And this leads to a more poignant observation: that the President's separation of powers and related executive privileges as derived from the United States Constitution do not inure to the benefit of any state executive, such as those in New York.  No where does Article II refer to state governance nor that state governor possess this unique communication privilege.  Even under the most fantastical reading of Article II, it would be incredulous for someone to find any empowerment or protection for any state official or employee under this Article of the United States Constitution.  It would be the individual state's constitutional and legislative provisions that would define the parameters of its chief executive and/or its executive agencies' confidentiality privileges. *Id.* at 998 (No federal court has "recognized the assertion of the presidential communication privilege by a state governor" or agency.).  Under our current scheme, the deliberative process privilege, as we know it, was developed by virtue of both the federal's and state's Freedom of Information Acts.

Nonetheless, the Supreme Court in *Nixon* rejected the Presidential Executive Privilege as being absolute and unqualified and further determined that the privilege may have to be set aside when confronted by other constitutional rights such as due process.  *Nixon*, 418 U.S. 713; *see also Cheney v. United States Dist. Court of Dist. of Columbia,* 542 U.S. 367.

deliberative. *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (citing, *inter alia*, *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184-85 (1975)). Post decisional memoranda which sets forth the reason for the agency's decision are not protected under this doctrine. A *Michael's Piano, Inc. v. F.T.C.*, 18 F.3d at 147. An inter-agency or intra-agency document may be withheld from the public purview if it is prepared in order to assist an agency in arriving at its decision and actually related to the process by which policies are formulated. *Nat'l Council of La Raza v. Dept. of Justice*, 411 F.3d 350, 356 (2d Cir. 2005). Intra-agency documents are those that remain within a single agency's walls while inter-agency documents are those that pass from one governmental agency to another; but in terms of this privilege, they are treated the same. *Tigue v. United States Dep't. of Justice*, 312 F.3d at 77-78. Generally speaking, the efficiency of government would be clearly hamstrung if it was not for such protection. *Hopkins v. United States of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991).

The deliberative process privilege "does not operate indiscriminately to shield all decision-making by public officials." *Schiller v. City of New York*, 2007 WL 136149, at *10 (S.D.N.Y. Jan. 19, 2007) (quoting *Grossman v. Schwartz*, 125 F.R.D. 376, 381 (S.D.N.Y. 1989)). As a general rule, the privilege does not cover purely factual matters. *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d at 482 (quoting *Envt'l Prot. Agency v. Mink*, 410 U.S. 73, 87-88 (1973) for the proposition that "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery") & *Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B.*, 845 F.2d 1177, 1180 (2d Cir. 1988) ("Purely factual material not reflecting the agency's deliberative process is not protected.")); *Cipolla v. County of Rensselaer*, 2001 WL 1223489, at *2 (N.D.N.Y. Oct. 10, 2001). Nor does it protect

documents which are peripheral to the policy formulation. *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d at 482. Furthermore, if an agency has adopted or incorporated by reference a pre-decisional memorandum into the final decision, that memorandum must be disclosed. *Wood v. FBI*, 432 F.3d 78, 83 (2d Cir. 2005) (citations omitted). And lastly, the privilege is not absolute but rather qualified. *Ebbert v. Nassau County*, 2007 WL 674725, at *11 (E.D.N.Y. Mar. 5, 2007); *Schiller v. City of New York*, 2007 WL 136149, at *8 ("The privilege is a qualified one, requiring courts to balance the agency's interest in non-disclosure against the public interest in opening for scrutiny the government's decision-making process." (internal quotations and citations omitted)).

The deliberative process privilege is fashioned in such a way that it protects the government's deliberative process from inquiry if it is collateral to the litigation itself. However, if the party's cause of action is directed at the government's intent in rendering its policy decision and closely tied to the underlying litigation then the deliberative process privilege "evaporates." *In re Subpoena Duces Tecum Served on the Office of the Comptroller*, 145 F.3d 1422, 1424 (D.C. Cir. 1998)[12] (cited in *State of New York v. Oneida Indian Nation of New York (Oneida II)*, 2007 WL 2287878, at *14 (N.D.N.Y. Aug. 7, 2007)); *McPeek v. Ashcroft*, 202 F.R.D. 332, 335 (D.D.C. 2001) ("It is certainly true that this privilege yields when the lawsuit is directed at the government's subjective motivation in taking a particular action."). The historical and overwhelming consensus and body of law within the Second Circuit is that when the decision-making process itself is the subject of the litigation, the deliberative process privilege cannot be a bar to discovery. *Ebbert v.*

---

[12] Many cases cite to this District of Columbia Circuit Court ruling in establishing the principle upon which the deliberative process privilege may be waived. However, this same Circuit revisited the matter in the same case and modified its holding as follows: "And our holding that the deliberative process privilege is unavailable is limited to those circumstances in which the cause of action is directed at the agency's subjective motivation." *In re Subpoena Duces Tecum Served on the Office of the Comptroller*, 156 F.3d 1279-80 (D.C. Cir. 1998).

*Nassau County*, 2007 WL 674725, at *11 (finding that when the deliberations are "among the central issues in the case" or "when the subject of the lawsuit is the very nature of the decision making process, the privilege should not foreclose the production of critical information") (internal quotations and citations omitted); *Mitchell v. Fishbein*, 227 F.R.D. 239, 250 (S.D.N.Y. 2005) (surveying cases on the waiver); *State of New York v. Oneida Indian Nation of New York (Oneida I)*, 2001 WL 1708804, at *6 (N.D.N.Y. Nov. 9, 2001) (finding that the privilege must give way when the decision making process is the subject of the litigation) (citing *Marisol* A *v. Giuliani*, 1, 1998 WL 132810, at *7-8 (S.D.N.Y. Mar. 23, 1998)); *Mr. and Mrs. B. v. Bd. of Educ. of Syosset Cent. Sch. Dist*, 35 F. Supp. 2d 224, 230 (E.D.N.Y. 1998) (when the agency's position is "pivotal to the lawsuit"); *Dep't of Econ. Dev. v. Arthur Andersen & Co.*, 139 F.R.D. 295, 299 (S.D.N.Y. 1991) ("Where the deliberations of government are genuinely at issue, privileges designed to shield the deliberative process from public scrutiny 'may not be raised as a bar against disclosure.'") (quoting *Burka v. New York City Trans. Auth.*, 110 F.R.D. 660, 667 (S.D.N.Y. 1986) & citing *Grossman v. Schwarz*, 125 F.R.D. 376, 385 (S.D.N.Y. 1989)).  Even "when the factors shaping the decisions made by governmental officials are at issue," the privileges may not be raised to prevent disclosure. *Natural Res. Defense Council v. Fox*, 1998 WL 158671, at *5 (S.D.N.Y. Apr. 6, 1998).

On all accounts, the crux of CFF's case is the deliberative process employed by the Defendants in rejecting CFF's applications for a custom license plate.  CFF is challenging the process by which Defendants made their decision, claiming that it was viewpoint-based censorship. By claiming that Defendants acted in an arbitrary manner and exercised an unbridled discretion in rendering their policy decision, which allegedly denied CFF due process and equal protection of the law, has made the process the cornerstone of this litigation.  Stated another way, in alleging that

*-16-*

Defendants engaged in and facilitated content-based and viewpoint-based discrimination when rejecting its application and in charging Defendants acted upon a policy wrought with vagaries and overbroadness, CFF has identified the deliberative process as the fulcrum of this litigation.  For all purposes, there is not doubt that the sum of CFF's causes of action is directed at Defendant's purported subjective motives and thus a subject matter of the litigation.  In this regard, the deliberative process privilege that has shielded, in significant respects, the State Defendants documents from public scrutiny must now disappear.

We disagree with the State Defendants' assessment that the documents CFF seeks are "utterly unrelated to plaintiff's claims."  Dkt. No. 114-2, Mem. of Law at p. 10.  The equal protection and due process claims have everything to do with the deliberative process and those documents which were an integral part of the process may lend support to CFF's claims.  And we further dismiss the State Defendants' overture that this is a "routine intrusion" of the deliberative process; it is nothing of the sort.  Although the State Defendants cast CFF's interest in discovering these documents as "negligible," the record before this Court proves otherwise.

Notwithstanding the consistent thread of precedents that have pierced the deliberative process privilege when the deliberative process is closely tied to the litigation, the State Defendants press this Court to subject its documents to a "*balancing test*, not a rule of *per se* waiver."  *Id*. at p. 9 (emphasis in original).  Because the deliberative process privilege is a qualified privilege, courts have recognized a balancing test between the interest of the litigant and the public's need to know and the government's need to protect frank discussion and to prevent injury to the quality of the agency's decision.  The factors supporting this balancing test are (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the seriousness of the litigation

and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable. *In re Subpoena Duces Tecum Served on Office of Comptroller*, 145 F.3d at 1424; *Dep't of Econ. Dev. v. Arthur Anderson*, 139 F.R.D. at 298-299; *In re Franklin Nat'l. Bank Sec. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y., 1979). Of all of the cases cited above that waived the privilege when the deliberative process was the subject matter of the litigation, none of them engaged in the balancing test. *See e.g. In re Subpoena Duces Tecum*, 145 F.3d at 1425 (after finding that the process was a central issue in the litigation, the court further found "no need to engage in the balancing test"). And in those cases cited by The State Defendants where the balancing test occurred, the deliberative process was not pivotal to the litigation. *See In re Franklin Nat'l. Bank Sec. Litig.*, 478 F. Supp. 577 & *Resolution Trust Corp. v. Diamond*, 137 F.R.D. 634 (S.D.N.Y. 1991). Accordingly, the Court stands by its ruling above and finds no need to engage in a balancing test.

Just because we have found that the deliberative process evaporates in this case, it does not necessarily follow that all of those documents identified as such (*see supra* note 10) have lost all of their protections. It appears that some of these documents may have an additional, independent protection from disclosure. We note that all but four of the documents that have been identified as protected by the deliberative process privilege are also identified as protected by either the attorney-client privilege, the work product doctrine, or both. There is a caveat to presuming that these independent protections, whether attorney-client privilege or work product or both, generally and inextricably protect those documents that have lost their protection under the deliberation process privilege. Much like the deliberative process privilege, "the attorney-client privilege may not be

invoked to protect a document adopted as, or incorporated by reference into, an agency policy."

*Nat'l Council of La Raza v. Dep't. of Justice*, 411 F.3d 350, 360 (2d Cir. 2005). However, where

an agency does not adopt a legal memorandum's conclusion and just merely relies on the

document's conclusion, the memorandum does not lose the insulation afforded it by other privileges.

*Wood. v F.B.I.*, 432 F.3d 78 (2d Cir. 2005) (continued to be protected by the work product doctrine).

This Court has examined all of the documents alleged to be privileged under the deliberative

process privilege as well as either the attorney-client privilege or the work product doctrine and

found none of them were adopted or incorporated into the DMV's decision to reject CFF's

application for a custom license plate. Thus it is not readily apparent that any waiver has occurred

under this scenario. *See Raba v. Suozzi*, 2007 WL 128817 (E.D.N.Y. Jan. 11, 2007) (discussing *In

re County of Erie*, 473 F.3d 413 (2d Cir. 2007)). Therefore, each of these documents will have to

be scrutinized under the law applicable to those other privileges.

### C. Attorney-Client Privilege and the Work Product Doctrine

#### 1. Attorney-Client Privilege

The attorney-client privilege is a longstanding, common law privilege recognized in New

York and by the federal courts under FED. R. EVID. 501. This privilege encourages full engagement

between a party and her attorney so that full and frank communication exists to impart all the

information an attorney may need in order to give sage and cogent advice on the matter. *Swidler

& Berlin v. United States*, 524 U.S. 399, 403 (1998); *United States v. Schwimmer,* 892 F.2d 237, 243

(2d Cir. 1989) ("[The] communications between attorney and client endure as the oldest rule of

privilege known to the common law."). Accordingly, its essential purpose is to encourage clients

to be fully forthcoming with their attorney and to receive, in return, advice which will protect the

clients' legal rights.  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *United States v. Const. Prod. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996); *United States v. Blizerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *see also NXIVM v. O'Hara*, 241 F.R.D. 109, 124-26 (N.D.N.Y. 2007).

When determining if there is in fact an attorney-client privilege present to cloak both the client's communication and the corresponding legal advice, a court needs to ascertain that this safety net attaches to only those communications (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) is at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived.  *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) (citing *United States v. Constr. Prod. Research, Inc.*, 73 F.3d at 473) (listing the elements that include that the communication is made "for the purpose of obtaining or providing legal advice"); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997) (citing *In Re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036 (2d Cir. 1984)); *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943-44 (2d Cir. 1992); *Madanes v. Madanes*, 199 F.R.D. 135, 143 (S.D.N.Y. 2001) (citing, *inter alia*, *In re Richard Roe, Inc.*, 68 F.3d 38, 39-40 (2d Cir.1995) & quoting *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir.1961)); *see also* 8 WIGMORE, EVIDENCE § 2292 (McNaughton rev. ed. 1961).  It is axiomatic that the burden of proving each element of the privilege rests on the party claiming the protection.  *In re County of Erie,* 473 F.3d at 418 (citing *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) & *United States v. Int'l Broth. of Teamster Chauffeurs, Warehousemen and Helpers of Am. AFL-CIO*, 119 F.3d 210, 214 (2d Cir. 1997)); *In re Horowitz*, 482 F.2d 72, 82 (2d Cir. 1973).

Contrary to modern yet ill-informed perceptions, the attorney-client privilege is often

"[n]arrowly defined, riddled with exceptions, and subject to continuing criticism." *United States v. Schwimmer*, 892 F.2d at 243. The attorney-client privilege is not given broad, unfettered latitude to every communication with a lawyer, but is to be narrowly construed to meet this narrowest of missions. *In re County of Erie*, 473 F.3d at 418 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976) (The privilege "appl[ies] only where necessary to achieve its purpose"));[13] *see also In re Horowitz*, 482 F.2d at 81 (privilege ought to be "strictly confined within the narrowest possible limits consistent with the logic of its principle") (quoting 8 WIGMORE § 2292 at 70); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214.

In today's world, an attorney's acumen is sought at every turn, even average attorneys mix legal advice with business, economic, and political advice. *NXIVM v. O'Hara*, 241 F.R.D. at 126 (citing *In re County of Erie*, 473 F.3d at 419-20). Since government has an equal claim for the protection of attorney-client privilege communication as any other legal entity, the same situation applies to government attorneys who are obligated to provide legal advice to "officials responsible for formulating, implementing and monitoring governmental policy" even when they may or may not have policy duties. *In re County of Erie*, 473 F.3d at 419 (citing *Upjohn Co. v. United States*, 449 U.S. at 389).[14] However, when a government lawyer may have a dual role encompassing both

---

[13] There is the general maxim that the public, particularly within the judicial forum, is entitled to be exposed to "everyman's evidence." 8 WIGMORE, EVIDENCE § 2317 (McNaughton rev. ed. 1961). The quest is for the truth of the matter to flow forward before the court, and "[t]he suppression of truth is a grievous necessity at best . . . [only justified] when the opposed private interest is supreme." *In re Megan-Racine Assocs., Inc.*, 189 B.R. 562, 570 (Bankr. N.D.N.Y. 1995) (quoting *McMann v. Sec. and Exch. Comm'n*, 87 F.2d 377, 378 (2d Cir. 1937)). But since the attorney-client privilege "stands in derogation of the public's right to everyman's evidence, . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of the principle." *In re Grand Jury Proceedings v. John Doe*, 219 F.3d 175, 182 (2d Cir. 2000) (citing *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214).

[14] The Second Circuit recognized that a government "lawyer's lack of formal authority to formulate, approve or enact policy does not actually prevent the rendering of policy advice to officials who do possess that authority." *In re County of Erie*, 473 F.3d 413, 421 (2d Cir. 2007). Moreover,

[i]t is to be hoped that legal considerations will play a role in governmental policymaking. When a

legal and policymaking, as possibly Dunn may have,[15] "[s]o long as the **predominant purpose** of

the communication is legal advice" the privilege prevails. *Id*. at 420 (emphasis added); *E.B. v. New*

*York City Bd. of Educ.,* 2007 WL 2874862, at *2 (E.D.N.Y. Sept. 27, 2007) (noting that the

"communication must be to render or solicit legal advice as opposed to business or policy advice");

*NXIVM Corp. v. O'Hara*, 241 F.R.D. at 126.  To this extent, documents, such as memoranda and

emails that were prepared and sent for the predominant purpose of soliciting or rendering legal

advice, may be protected by the attorney-client privilege.  *E.B. v. New York City of Bd. of Educ.*,

2007 WL 2874862, at *3 (citing *In re County of Erie*, 473 F.3d at 422-23).  This predominant

purpose must be assessed "dynamically and in light of the advice being sought or rendered, as well

as the relationship between the advice that can be rendered only by consulting with the legal

authorities and advice that can be given by a non-lawyer[.]"  *Raba v. Suozzi*, 2007 WL 128817, at

*2 (quoting *In re County of Erie*, 473 F.3d at 420-21).  "When a lawyer has been asked to assess

compliance with a legal obligation, the lawyer's recommendation of a policy that complies (or better

complies) with the legal obligation – or that advocates and promotes compliance, or oversees

implementation of compliance measure – is legal advice."  *In re County of Erie*, 473 F.3d at 422

(quoted in *MacNamara v. City of New York*, 2007 WL 755401, at *7 (S.D.N.Y. Mar. 14, 2007)).

---

> lawyer has been asked to assess compliance with a legal obligation, the lawyer's recommendation of
> a policy that complies (or better complies) with the legal obligation–or that advocates and promotes
> compliance, or oversees implementation of compliance measures–is legal advice.  Public officials who
> craft policies that may directly implicate the legal rights or responsibilities of the public should be
> "encouraged to seek out and receive fully informed legal advice" in the course of formulating such
> policies.  *In re Grand Jury Investigation,* 399 F.3d 527, 534 (2d Cir. 2005).

*Id*. at 422; *see also E.B. v. New York City Bd. of Educ.*, 2007 WL 2874862, at *7 (E.D.N.Y. Sept. 27, 2007) (noting that
legal considerations play a role in governmental policymaking).

[15]  Dunn denies that she had any "policy-making authority or administrative responsibility for the sponsorship
plate program at DMV."  Dkt. No. 117, Dunn's Mem. of Law at p. 1.

### 2.  Work Product Doctrine

The State Defendants assert that CFF threatened to initiate litigation against them on at least two occasions during their deliberative process.  On March 22, 2002, DMV was notified that Attorney Raum was retained by CFF to represent its interest.  On May 8, 2002, CFF's attorney threatened to seek judicial intervention if he did not receive a satisfactory response on the application.  Dkt. No. 114-2, at p. 22. Further, on February 19, 2004, Attorney Raum repeated his threat.  Based upon CFF's Counsel's letters, the State Defendants rightfully believed that litigation over the denial of the custom license plate was imminent.  *Id*.  Assessing CFF's threats and considering, *inter alia*, the prolific and ubiquitous litigation history surrounding "Choose Life" custom license plates, the State Defendants aver that they anticipated litigation with CFF over its application and thus began preparing their defense.  Accordingly, the State Defendants declare work product doctrine covers a significant portion of the documents that they alleged to be privileged.

The work product privilege is more broad than the attorney-client privilege, *In re Grand Jury Proceedings*, 219 F.3d 175, 190 (2d Cir. 2000), and it exists to protect attorneys' mental impressions, opinions, and/or legal theories concerning litigation, *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 12 (2d Cir. 1989).  Indeed, the work product privilege is designed to protect an adversarial system of justice and has been analyzed in that context by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).  This doctrine establishes a "zone of privacy" in which a lawyer can prepare and develop theories and strategies with an eye towards litigation free from unnecessary intrusion by his or her adversaries.  *United States v. Adlman* (*"Adlman I"*), 68 F.3d 1495, 1500-01 (2d Cir. 1995) (citing *United States v. Nobles,* 422 U.S. 225, 238 (1975) & *Hickman v. Taylor*, 329 U.S. at 516);. *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299-

1300 (D.C. Cir. 1980) (The purpose "is to protect a material from an opposing party in litigation.").

Of course the burden, albeit not a heavy one, of establishing that the work product doctrine applies

rests with that party's attorney who is claiming the protection.  The work product doctrine, like the

attorney-client privilege, "does not extend to every document generated by the attorney; it does not

shield from disclosure everything a lawyer does."  *Rattner v. Netburn*, 1989 WL 223059, at *6

(S.D.N.Y. Dec. 7, 2005).  Omnipresent is the concern that revelation of the attorney's mental

processes is real and not just speculative.  *Gould Inc. v. Mitsui Mining & Smelting Co., Ltd.*, 825

F.2d 676, 680 (2d Cir. 1987).

FED. R. CIV. P. 26(b)(3)(A) and (B) provides a relevant rule on the discovery of work product

material.  It reads in part:

> Ordinarily, a party may not discover documents and tangible things that are prepared
> in anticipation of litigation or for trial by or for another party or its representative
> (including the other party's attorney, consultant, surety, indemnitor, insurer, or
> agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> > (i) they are otherwise discoverable under Rule 26(b)(1); and
> > (ii) the party shows that it has substantial need for the materials to prepare its
> > case and cannot, without undue hardship, obtain their substantial equivalent
> > by other means.
>
> If the court orders discovery of those materials, it must protect against disclosure of
> the mental impressions, conclusions, opinions, or legal theories of a party's attorney
> or other representative concerning the litigation.[16]

It is important to note that the work product doctrine classifies documents into two categories: "non-

opinion" work product and "opinion" work product.  The distinction between these two categories

turns on the effort employed in obtaining disclosure pursuant to Rule 26(b)(3).  For "non-opinion"

work product, the party seeking this information must show a substantial need for the document and

---

[16] This Federal Rule was amended becoming effective on December 1, 2007.  Although this particular Rule's
format has been modified and there has been slight alteration of the statutory text, the content and context have remained
virtually unchanged.  The Advisory Committee Notes for 2007 do not note any material change to this provision of the
law.  Thus, those court precedents as stated above remain applicable.

undue hardship to acquire the document or its substantial equivalent by other means.  On the other

hand, "opinion" work product requires a higher protection to the extent that the requesting party has

to demonstrate extraordinary justification before the court will permit its release.  *Strougo v. BEA*

*Assocs.*, 199 F.R.D. 515, 521 (S.D.N.Y. 2001) (citing *In re Sealed Case*, 676 F.2d 793, 809-10 (D.C.

Cir. 1982)); *see also Upjohn Co. v. United States*, 449 U.S. at 401.  At a minimum, such "opinion"

work product should remain protected until and unless a highly persuasive showing is made.  *In re*

*Grand Jury Proceedings*, 219 F.3d at 191; *United States v. Adlman* (*"Adlman II"*), 134 F.3d 1194,

1204 (2d Cir. 1998).  In a similar vein, in most instances, the work product doctrine extends to facts

but those facts can be readily revealed, as stated above, upon a showing of substantial need and

undue hardship.  *In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002)

(citing FED. R. CIV. P. 26(b)(3)).  Nonetheless, non-privileged facts that are in the sole possession

of an adversary, and not readily available to the party seeking the information, should be freely

discoverable.  *NXIVM Corp. v. O'Hara*, 214 F.R.D. at 127.

"[W]here a party faces the choice of whether to engage in a particular course of conduct

virtually certain to result in litigation and prepares documents analyzing whether to engage in the

conduct based on its assessment of the likely result of the anticipated litigation, [it should be]

conclude[d] that the preparatory documents should receive protection under Rule 26(b)(3)."  *Adlman*

*II,* 134 F.3d at 1196.  The crux being that a document which has been prepared because of the

prospect of litigation will not lose its protection under the work product doctrine, even though it may

assist in business or policy decisions.  *E.B. v. New York City Bd. of Educ.*, 2007 WL 2874862, at *5;

*Strougo v. BEA Assocs.*, 199 F.R.D. at 521 ("Where a document is created because of the prospect

of litigation, analyzing the likely outcome of that litigation, it does not lose protection under this

Case 1:04-cv-00927-DNH-DJS   Document 157   Filed 12/10/07   Page 26 of 41

formulation merely because it is created to assist with a business decision." (citing *Adlman II*, 134 F.3d at 1202)); *Adlman I*, 68 F.3d at 1502.  But this protection will not be extended, under any circumstances, to records that are prepared in the ordinary course of business.  *Adlman II*, 134 F.3d at 1202; *Adlman I*, 68 F.3d 1502.  Even though the work product doctrine protects the impressions, opinions, theories, and strategies of an attorney, Rule 26(b)(3) makes clear that the document at issue, either obtained or prepared by or for a party, or by or for his representative, may be cloaked by this doctrine as well.  *Id.*; *E.B. v. New York City Bd. of Educ.*, 2007 WL 2874862, at *5 (citing, *inter alia*, *Lugosch v. Congel*, 2006 WL 931687, at *16 (N.D.N.Y. Mar. 7, 2006)).  This maxim makes sound sense considering how complex litigation can be and the undeniable need for others to assist in developing all that is necessary to prosecute or defend a lawsuit.  Obviously, impressions and strategies are not always created in a vacuum, but, rather are generated in cogent discourse with others, including the clients and agents.  Further, the exchange of such documents and ideas with those whose expertise and knowledge of certain facts can help the attorney in the assessment of any aspect of the litigation does not invoke a waiver of the doctrine.  *United States v. Nobles*, 422 U.S. at 239; *Adlman I*, 68 F.3d at 1502.

### 3.  Common Interest Doctrine

In this case, New York State's Executive Chamber, the seat of the executive branch, is implicated as indicated by the former Governor being sued individually and the current Governor in his official capacity. As to the matter before us, DMV's Deputy Counsel and Legal Department corresponded and communicated regularly with Governor's Counsel and staff about CFF's applications and the policy and legal ramifications thereof.  And, in this context, The State Defendants claim that all of these communications are protected under the common interest doctrine.

-26-

Often the common interest doctrine and the joint defense privilege are intertwined and deemed synonymous. *Lugosch v. Congel*, 219 F.R.D. 220, 236 n.10 (N.D.N.Y. 2003) (noting that common interest doctrine and joint defense doctrine are synonymous while the common interest arrangement and pooled information doctrines, which may be broader, are distinguishable). They are nonetheless an extension of the attorney-client privilege and the work product doctrine. *Gulf Islands Leasing Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 472 (S.D.N.Y. 2003). The common interest doctrine and the joint defense privilege are best summarized in *United States v. Schwimmer,*:

> The joint defense privilege, more properly identified as the "common interest rule," *see generally* Capra, *The Attorney-Client Privilege In Common Representations*, 20 Trial Lawyers Quarterly, Summer 1989, at 20, has been described as "an extension of the attorney client privilege," *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 583 n.7 (9th Cir.1987). It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. *See United States v. Bay State Ambulance and Hosp. Rental Serv.*, 874 F.2d 20, 28 (1st Cir.1989). Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected. *Eisenberg v. Gagnon*, 766 F.2d 770, 787 (3d Cir. 1985), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120 (3d Cir.1986). "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter," Capra, 20 Trial Lawyers Quarterly, at 21 (citation omitted), and it is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply, *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir.1987), *vacated in part on other grounds*, 842 F.2d 1135 (9th Cir.1988) (en banc), *aff'd in part and vacated in part on other grounds*, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). Neither is it necessary for the attorney representing the communicating party to be present when the communication is made to the other party's attorney. *Matter of Grand Jury Subpoena*, 406 F. Supp. 381 (S.D.N.Y. 1975); *cf. Hunydee v. United States*, 355 F.2d 183 (9th Cir.1965).

892 F.2d 237, 243-44 (2d Cir. 1989).

In order then for documents and communications shared amongst those who may participate

*-27-*

in a joint defense or common interest scheme to be considered confidential, there must exist an agreement, though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy. *Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999) (citation omitted); *United States v. Weissman*, 1996 WL 737042, at *10 (S.D.N.Y. Dec. 26, 1996) (survey of cases). Paramount to the common interest doctrine, there must be a commonality of interest amongst the members to the agreement and each party must reasonably understand that the communications are provided in confidence. *United States v. Weissman,* 195 F.3d 96, 99 (2d Cir. 1999); *Bank Brussels Lambert v. Credit Lyonnais Suisse S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995) (commonality of interest is more than concurrent interest). And "[o]nly those communications made in the course of ongoing common enterprise and intended to further the enterprise are protected." *United States v. Weissman*, 195 F.3d at 99; *see generally Lugosch v. Congel*, 219 F.R.D. at 235-39.

To the extent that the communications were made in confidence amongst the agreement's allies, they ought to be deemed confidential pursuant to the attorney-client privilege. *In re Grand Jury Subpoena Duces Tecum dated November 16, 1974*, 406 F. Supp. 381, 392 (S.D.N.Y. 1975) ("That a joint defense may be made by somewhat unsteady bedfellows does not in [and of] itself negate the existence or viability of the joint defense."). But, and it is worth repeating, **only** those communications made in the course of an ongoing common litigation enterprise with the intent to further the enterprise are protected. *United States v. Schwimmer*, 892 F.2d at 243; *In re Bevill, Bresler & Schulman Asset Mgmt Corp.*, 805 F.2d 120, 126 (3d Cir. 1986). The Court is persuaded, in light of *Schwimmer*, that if a joint defense agreement or common interest exists there is an implicit understanding that one attorney is permitted not only to confer with another attorney but

-28-

with the other attorney's party.  *United States v. Schwimmer*, 892 F.2d at 244 (citing *In re Grand Jury Subpoena*, 406 F. Supp. at 391-92 (permitting attorney interviews of others without the presence of their own attorney and in the presence of other co-defendants)); *see also United States v. McPartlin*, 595 F.2d 1321, 1336-37 (7ᵗʰ Cir. 1979) (deeming confidential communications to an investigator for a co-defendant's attorney fell within the joint defense privilege); *United States v. Walker*, 910 F. Supp. 861, 865 (N.D.N.Y. 1995) (investigator and other agents).  It is clear that the parties conferring amongst themselves, outside the confines of the group, and not for the purpose of collecting information in order to obtain legal advice, does not preserve the privilege because in that event they are not seeking legal advice or sharing information to receive legal advice.  *Lugosch v. Congel*, 219 F.R.D. at 238.

The Executive Chamber and state agencies are inextricably interlocked, with a few exceptions, *New York ex rel. Boardman v. Amtrak*, 233 F.R.D. 259, 263 (N.D.N.Y. 2006), and the nexus, whether policy or legally driven, is utterly obvious.  Under Article V, Section 2 of the New York State Constitution and New York's Executive Law § 30, all executive departments are subsumed within the executive branch.[17]  The Executive Chamber and the state agencies will generally fall within the common interest doctrine and, in this respect, communications between Governor's Counsel and staff and DMV's Counsel and legal staff are absolutely and unmistakenly encompassed by this doctrine insofar as they have an inseparable and abiding common interest in

---

[17] The New York Executive Law section 30 states

[t]here shall continue to be in the state government an executive department.  The head of the executive department shall be the governor.  The governor may appoint such subordinates and employees as may be necessary for the exercise of his powers and the powers and the performance of his duties as head of the executive department, and may prescribe their duties[.]

*see also* N.Y. CONST. Art. 4, § 1 ("The executive power is vested in the governor[.]").

The Department of Motor Vehicles is an executive department with the Commissioner appointed by the governor.  N.Y. VEH. TRAF. L. § 200.

ensuring that policies are both legal and constitutional.  Thus, there is no waiver of any of the privileges when DMV shared correspondence, memoranda, documents, and opinions with Governor's staff.  We are therefore obligated to review those communications between the Executive Chamber and DMV within the prism of the common interest doctrine.

### C.  Analysis of the Documents

Weighing all of the legal instruction cited above, we must now embark upon a review of the documents claimed to be privileged for sundry reasons.  In doing so, we are also mindful that redaction is available for those documents that may contain legal advice incidental to other nonlegal advice that is the predominant purpose of the communication.  *In re County of Erie*, 473 F.3d at 421, n.8; *Raba v. Suozzi*, 2007 WL 128817, at *4.  We also must reiterate that we have pierced the deliberative process in this case, but those documents may also be cloaked by either the attorney-client privilege or work product doctrine and thus may yet be protected.[18]  We note generally that most of the documents were circulated among attorneys in both the Governor's Counsel's Office and DMV's Legal Department.  In reviewing the documents, we find the following:

(1) *protected by the attorney-client privilege* - P 1, 9-11,[19] 12-13, 61, 63, 70, 105-110, 126, 160-165, 285, 286-288, 305-306, 308-310, 346-349, 354, 363-364, 368-374.

(2) *not protected by the attorney-client privilege* - P 88, 190-192, 298, 353, 365.

---

[18]  As a component of this Motion, the State Defendants disclosed the following documents: P 2, 4, 14-23, 39-42, 45-50,  64, 68-69, 97-104, 203-214, 288, and 307.  Furthermore, in terms of an analysis of those documents contended to be protected by the work product doctrine, CFF has not asserted a substantial need or undue hardship for those documents that may embrace facts gathered by the State Defendants and, therefore, will not be considered.  *See supra* Part II.C.2 (work product doctrine discussion).

[19]  P 11 is a part of this series of documents, but if it was already sent to CFF's counsel, and it appears that it may have, the document is waived.  Otherwise, if not forwarded to CFF, it remains privileged.

(3) *attorney-client privileged communication redacted* - P 3 (redact the third sentence after "Jill"); 59 (redact second paragraph beginning with Kristie's); 60 (redact all but first and third paragraphs at the end); 62 (redact paragraph commencing with Bill); 89 (redact the top half of the page); 90 (redact the first sentence; the balance of the first paragraphs remains; redact the middle portion of the page); 92-96 (redact handwriting on pages); 366-367 (redact the first paragraph).

(4) *protected by either the attorney-client privilege or the work product doctrine, or both* - P 5, 6-8, 24-38, 43-44, 51-58, 61, 65-67, 71-74, 75-80, 81-84, 112-125, 127-144, 166-173, 174-184, 185-189,  193-202, 220-227, 259-284, 289-290, 291-297, 299-304, 311-345, 355-362.

(5) *facts not protected by any privilege* - P 85-87, 145-159, 228-258.

(6) *P 215-219*: The State Defendants claim that these documents are protected by the deliberative process privilege, the attorney-client privilege, and the work product doctrine.  The State Defendants maintain that this document was part of a more comprehensive exchange between governmental lawyers.  That may be true, however, the document does not appear to fit neatly within an attorney-client privileged document nor has the earmarks of being prepared in anticipation of any litigation.  Moreover, it appears to be a document that had already existed and contains facts.  Without a broader appreciation of the nature of this document, notwithstanding the State Defendants' affidavit attempting to explain the broader cache of documents, this Court is prepared to disclose it; however, we will allow the State Defendants' to provide a more definitive characterization of the document to

save its protections.  The same task will hold true for P 350.

In terms of CFF's Motion to Compel, it would appear that we have just defined the scope of the privileges as to specific documents.  There remains, however, a debate among the Defendants as to whether a Defendant, who served as counsel to a state agency and sued in her individual capacity, may use for her defense several documents already determined to be protected by either the attorney-client privilege or the work product doctrine.

### D.  Piercing of Privilege Protections by Individual Defendant who served as an Attorney

As we have noted throughout, Defendant Dunn served as DMV's Counsel throughout the entire decision making process.  *See supra* note 15.  We further know that she has been sued in her individual capacity exposing her personally to a judgment and money damages for purportedly violating CFF's constitutional rights.   In order to adequately defend herself, Dunn contends that she needs to pierce her former client's attorney-client privilege and work product doctrine protections.  By piercing the privileges for seventeen selected documents,[20] Dunn postulates that she may be able to establish that DMV, and to the extent that her actions and/or decisions enfolded within DMV's decision to reject CFF's plate, always acted objectively reasonable thus making her qualified immunity defense viable.  Dkt. No. 117, Mem. of Law at p. 2.  Alternatively, Dunn argues that these documents will prove that she played no role in the ultimate decision not to grant CFF's plate application.  *Id*.  Her ability to pierce the privileges of these select documents rests upon two legal theorems: (1) her right to the self defense exception of DR 4-104(c)(1) and (4); and (2) an at issue waiver created by the State Defendants' assertion of the affirmative defense of qualified

---

[20] These seventeen documents comprise pages P 25-26, 27-38, 44-50, 60, 61, 66, 75-78, 79-80, 198-202, 289, 290, 299-300, 301, 302, 303-304, 305-308, and 356-362.  *See* Dkt. No. 116, Ex. A, Dunn's Privilege List.  Furthermore, Exhibit A also provides the specific reasons for the disclosure of each of the documents.  We further note that P 45-50, and 307 have already been disclosed by the State Defendants.

immunity on behalf of the individual Defendants. *Id*. at pp. 2-3.

The State Defendants dismiss, as lacking merit, Dunn's argument that these select documents are needed for her defense because the privileges that she wishes to invade belong solely to her client and, moreover, there is a volume of non-privileged materials Dunn could use in lieu of these chosen documents, although these documents are never identified. Dkt. No. 147, State Defs.' Reply Mem. of law at p. 1. By cherry picking certain documents and shielding others, the State Defendants argue that Dunn is essentially using the privileges as both a shield and a sword which is improper. *Id*. at p. 2.

### 1. DR 4-104(c)(1) and (4)

It is axiomatic that an attorney is required to preserve a client's confidences and secrets. N.Y. COMP. CODES R. & REGS. tit. 22, § 1200.19 (DR 4-101(a) & (b)). But this same Discipline Rule carves out an exception to this axiom and permits a "lawyer to reveal [c]confidences or secrets necessary to establish or collect the lawyer's fee or to defend the lawyer or his or her employees or associates against accusation of wrongful conduct." *Id*. (DR 4-101(c)(4)). The State Defendants intimate that this self defense exception exist only when an attorney is being sued by her client. Dkt. No. 147, State Defs.' Mem of Law at p. 2. But the broad expanse of common law, at least within the Second Circuit, states otherwise.

The Second Circuit has embraced DR 4-101(c)(4) and confirmed that a lawyer, when sued, may reveal confidences or secrets necessary to defend herself against an accusation of wrongful conduct. *Meyerhofer v. Empire Fire & Marine Ins. Co.*, 497 F.2d 1190, 1194-95 (2d Cir. 1974) (recognizing that an attorney sued by a party other than his client may be entitled to disclose his client's confidences, even though the case did not turn on this point); *In re Nat'l Mortgage Equity*

*Corp. Pool Certificates Sec. Litig*, 120 F.R.D. 687, 691 (C.D. Cal. 1988) (identifying *Meyerhofer* as a seminal case on this issue and further finding its reasoning persuasive).  Since *Meyerhofer* was issued, courts within the Second Circuit have fully adopted this Discipline Rule to support an attorney's "right to support his version of the facts with suitable evidence," *First Fed. Sav. & Loan Ass'n of Pittsburgh v. Owens*, 110 F.R.D. 557, 562 (S.D.N.Y. 1986), which may mean revealing his client's confidential communications "in an effort to clear his or her name."  *Stirum v. Whalen*, 811 F. Supp. 78, 83-84 (N.D.N.Y. 1993) (noting that an attorney must be permitted to defend themselves when accused of wrongful conduct).[21]  It would be a "manifest injustice" to permit a client to withhold privileged communications to the attorney's disadvantage, especially when sued, *Louima v. City of New York*, 2004 WL 2359943, at *70 (E.D.N.Y. Oct. 5, 2004), and it would ill serve the "truth-finding function of the litigation process."  *First Fed. Sav. & Loan Ass'n of Pittsburgh v. Owens*, 110 F.R.D. at 565 (noting that such disclosure would be "consistent with the general principle of narrowly construing evidentiary privileges").  The self defense exception is not restricted to fee disputes between the attorney and client nor available only when the client sues her attorney.  The Discipline Rule encompasses all of those circumstances when an attorney has been accused of misconduct, even when sued by someone other than the client.  *Id*. at 562; *Trepel v. Dippold*, 2005 WL 2206800, at *3 (S.D.N.Y. Sept. 12, 2005) (when discussing whether attorney party could reveal confidences, the court cited *Meyerhofer* for the proposition that an attorney has

---

[21] The State Defendants argue that *Stirum v. Whalen*, 811 F. Supp. 78 (N.D.N.Y. 1993) is inapplicable because the case was decided on the basis of the crime-fraud exception to the attorney-client privilege.  Dkt. No. 147 at p. 3, note 2.  We agree that some of the privileged documents in that case were released because of the crime-fraud exception, but had the the State Defendants read further they would have noted that the attorneys, who were sued along with their client, requested to reveal confidential communications.  Because there were numerous allegations of wrongdoing by the law firm, the *Stirum* court granted the defendant attorneys authority to disclose confidential documents and testify about their role in all aspects of the events.  *Stirum v. Whalen*, 811 F. Supp. at 83-84.

*-34-*

the right to defend himself even when the wrongdoing is made by someone other than the client); *Morin v. Turpin*, 728 F. Supp. 952, 956 (S.D.N.Y. 1989) (finding that when an attorney along with others was sued for securities fraud, that attorney had a right to disclose confidential communications with respect to his role in the matter); *Sec. Exch. Comm. v. Forma*, 117 F.R.D. 516, 524 (S.D.N.Y. 1987) (stating that formal charges need not be issued in order for the self defense exception to apply and further noting that "it would be senseless to require the stigma of an indictment to attach before allowing the lawyer to invoke the self-defense doctrine").  Under this self defense exception, however, disclosure of confidences can only be made in "the narrow context of [the attorney's] own defense."  *Housler v. First Nat'l Bank of East Islip*, 484 F. Supp. 1321, 1323 (E.D.N.Y. 1980).

We are persuaded by the precedents stated above that Dunn's interest in defending herself is so compelling that it outweighs the State Defendants' interest in maintaining confidentiality. *First Fed. Sav. & Loan Ass'n of Pittsburgh v. Owen*, 110 F.R.D. at 565.  Dunn has been sued individually and subject to money damages; under these circumstances, she is entitled to present her version of the facts with suitable evidence of her choosing.  The State Defendants attempts to circumnavigate the scope of the precedents cited above and their arguments are far adrift from these well reasoned and consistent decisions.  They also bemoan Dunn's intent to use seventeen privileged documents when she could alternatively utilize approximately 1300 pages of other documents that have already been released in discovery (some of them previously considered privileged document) and that these select privileged documents are irrelevant and unnecessary for her defense.  Dkt. No. 147 at pp. 4-5.  Essentially, the State Defendants' complaint, if granted, would serve to dictate how another Defendant may quantitatively and qualitatively pursue her defense, notwithstanding their erstwhile

professional relationship.  Such dictates and control of another's defense will not be honored, at least not under these circumstances.  Further, we do not observe Dunn asking to use these documents beyond the narrowly crafted context of her defense and there is no wholesale waiver of the privileges as The State Defendants fear.  Therefore, for these reasons and the applicability of self defense doctrine, the seventeen documents shall be disclosed.

## 2.  Qualified Immunity Defense

The qualified immunity defense has been raised several times in this litigation.  It was raised in the State Defendants' First Motion to Dismiss, first Answer, Appeal to the Second Circuit, and Amended Answer.  *See* Dkt. No. 51, Am. Ans. at ¶ 131 ("At all relevant times, defendants acted under the reasonable belief that their conduct was in accordance with clearly established laws.  They are, therefore, protected under the doctrine of qualified immunity.").  Defendants also pled that they were not personally involved in the alleged constitutional or statutory violations.  *Id*. at ¶ 133.  In this respect, Dunn wants to take advantage of these defenses to establish that her conduct was objectively reasonable in accordance with clearly established law and that she was not personally involved in the final decision.  And in order to successfully raise these two defenses, she claims the need to use documents that are protected by the attorney-client privilege and the work product doctrine.  Since the qualified immunity defense has been interjected into this case, an at issue waiver may have occurred.

Qualified immunity shields "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 359 (2d Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mollica v. Volker*, 229

F.3d 366, 370 (2d Cir. 2000).  This also applies "insofar as it was objectively reasonable for [the government officials] to believe that their acts did not violate those rights." *Mollica v. Volker*, 229 F.3d at 370 (internal quotation marks and citations omitted); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  The objectively reasonable test will be met "'if [officials] of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (further citation omitted)).  Public officials will further be entitled to qualified immunity if, "at the time the [official] was acting, the right in question was not clearly established[.]"[22] *Pitsley v. Ricks*, 2000 WL 362023, at *1 n.1 (N.D.N.Y. Mar. 31, 2000) (citing *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1988)).

It is well settled law that in "certain circumstances a party's assertion of factual claims can, out of consideration of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted." *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003) (citing, *inter alia*, *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)). The application of an "at issue" waiver is primarily due to the fact that the party asserting the privilege has placed "a contention at issue." *Id.* (citing, *inter alia*, *Worthington v. Endee*, 177 F.R.D. 113, 116-117 (N.D.N.Y. 1998) and 6 JAMES WM. MOORE ET AL, MOORE'S FEDERAL PRACTICE §

---

[22] "In order for the constitutional right to be clearly established, three elements must be met: '1) ... [that] the right in question [be] defined with reasonable specificity; 2) [that] the decisional law of the Supreme Court and applicable circuit court support the existence of the right in question; and 3) [that] under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.' *Mollica v. Volker*, 229 F.3d 366, 371 (2d Cir. 2000) (internal quotation marks and citations omitted) (alterations in original); *see also Moore v. Vega*, 371 F.3d 110, 114 (2d Cir.2004) (stating that in assessing whether defendants are entitled to qualified immunity, the Court must examine '[o]nly Supreme Court and Second Circuit precedent *existing at the time of the alleged violation*' to determine if a right is clearly established (citation omitted))."
*Luessenhop v. Clinton County, New York*, 2007 WL 1063650, at *5 (N.D.N.Y. Apr. 6, 2007).

26.70[6][c] (3d ed. 1997)).  Moreover, it is not the filing of the lawsuit that matters but the relevance

of the contention that controls.  *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F.R.D. 408 (D.

Del. 1992).  The test that the courts within the Second Circuit have resorted to in order to determine

whether an at issue waiver has occurred is:(1) assertion of the privilege was a result of some

affirmative act, such as filing suit, (2) through the affirmative act, the asserting party puts the

protected information at issue by making it relevant to the case, and (3) the application of the

privilege would have denied the opposing party access to information vital to the defense.  *Bank*

*Brussels Lambert v. Credit Lyonnais (Suisse),* 1995 WL 598971, at *3 (S.D.N.Y. Oct. 11, 1995)

(citing *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975)).[23]  The forfeiture of the privilege

should be narrowly construed and tailored to remedy the unfairness or prejudice.  *In re Grand Jury*

*Proceedings*, 219 F.3d 175, 188 (2d Cir. 2000).  "It is further axiomatic, when a number of

documents are claimed to be privileged, that there is no wholesale waiver but rather a specific

inquiry as to each document."  *Lugosch v. Congel*, 2006 WL 931687, at *23 (N.D.N.Y. Mar. 7,

2006).

It is also an established principle of law that if the advice of counsel is placed in issue by

either a claim, defense, or testimony, it is deemed waived.  *Rhone-Poulenc Rorer Inc. v. Home*

*Indem. Co.*, 32 F.3d 851 (3d Cir. 1994); *United States v. Bilzerian*, 926 F.2d 1285.  And when

defendants raise the affirmative defense of qualified immunity, it places the privilege and relevant

information at issue.  *Mitzner v. Sobol*, 136 F.R.D. 359, 362 (S.D.N.Y. 1991); *Hearn v. Rhay*, 68

F.R.D. 574, 581 (E.D. Wash. 1975) (finding that legal advice was germane to the affirmative defense

---

[23] There are other criteria which a court may consider in ascertaining whether an "at issue" forfeiture is applicable: (1) the very subject of privileged communication [is] critically relevant to the issue litigated, (2) there is a good faith basis for believing such essential privileged information exists, and (3) there is no other source of direct proof. *Bank Brussels Lambert v. Credit Lyonnais (Suisse)*, 1995 WL 598971, at *5.

of qualified immunity and the assertion of the privilege "deprive[d] plaintiff of the information necessary to defend" itself); *see also Pritchard v. County of Erie*, 2007 WL 3232096, at *4-5 (W.D.N.Y. Oct. 31, 2007) (citing *Hearn* for the proposition that asserting qualified immunity defense places protected information at issue).

It is obvious that qualified immunity inures to the individual defendants' benefit and not state agencies.  Even though represented collectively by the Attorney General prior to 2007, clearly the State Defendants interjected qualified immunity in this case for the sole purpose of protecting those state employees who were sued in their individual capacity.  Therefore, it is incumbent upon the individual defendants, such as Dunn, to demonstrate that she acted objectively reasonable or that the rights were not clearly established in order to establish her qualified immunity defense.  *Connecticut v. Crotty*, 346 F.3d 84, 102-03 (2d Cir. 2003).  In this context, qualified immunity is "both fact-intensive and fact-specific [defense][.]" *Id*. at 102.  Thus, the determination of objective reasonableness, an integral component of this affirmative defense, can only be made upon a factual record, which fact may include the rendering of and the legal advice given to DMV.  Similar to the self defense exception, a waiver of the privileges, under the at issue waiver, can be narrowly tailored to minimize any prejudice, and it appears Dunn's request fits that charge.  *Trudeau v. New York State Consumer Prot. Bd.*, 237 F.R.D. 325, 341 (N.D.N.Y. 2006).  And for this reason, as well, those seventeen documents will be disclosed.  *See supra* note 20.

### III. CONCLUSION

Because privileges remain for the largest lot of documents, the Court intends on remaining under seal those original documents that comprised the State Defendants' Opposition to CFF's Motion to Compel.  Those documents are the State Defendants' Memorandum of Law, Neal

*-39-*

Schoen's Affidavit, and the Exhibits submitted for an *in camera* review.  Dkt. No. 114.  All other

pleadings and documents, except Dunn's Exhibits (Dkt. No. 116), have already been provided to

everyone in full or redacted form, striking any specific factual references or discussion that may bear

upon the privileges of those documents.  With respect to the documents required to be disclosed,

consistent with the mandates of *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006),

this Court will not require the disclosure for at least ten (10) days in the event a party files objections

to this Memorandum-Decision and Order.

Accordingly, it is hereby

**ORDERED**, that CFF's Motion to Compel, Dkt. No. 113, is **granted in part and denied in part**, consistent with the decision above; and it is further

**ORDERED**, that Defendant Dunn's Motion to Compel, Dkt. Nos. 116 and 117, is **granted**; and it is further

**ORDERED**, that the Clerk of the Court shall file the State Defendants' original and unredacted version of its Opposition to CFF's Motion under seal; and it is further

**ORDERED**, that compliance with this Memorandum-Decision and Order shall be stayed for ten (10) days pending the filing of any objections; and it is further

**ORDERED**, that the parties shall provide dates and times when they may be available for a telephone conference during the week ending December 21, 2007, to discuss amending the Uniform Pretrial Scheduling Order.

*-40-*

**IT IS SO ORDERED**.

December 10, 2007
Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge